OPINION OF THE COURT
Barbara Howe, J.
Decedent, Mariano Falise (Max), died on January 11, 2001. Two daughters, Lena Marie Trowbridge and Deborah Geampa, survived him. Max’s second wife, Katherine, died before him in 1999, leaving a son, Dominic Braceo, whom decedent treated as one of his children. Max also had many siblings and nieces and nephews, including Paul Oleandi (hereafter Paul).
Max’s will, dated September 18, 1987, was admitted to probate in this court on June 5, 2001. The will leaves decedent’s entire probate estate to Lena and Deborah in equal shares per stirpes. The will also states that Katherine’s son, Dominic Braceo, should receive half of decedent’s probate estate in the event Katherine and Max died as a result of a common disaster, but that provision is ineffective because Katherine predeceased decedent.
The estate brought a proceeding to require Max’s nephew, Paul, to turn over to the estate monies which it contends are estate property. This claim includes the sum of $382,097.31 representing the balance in an M & T Bank savings account No. XXXX, the sum of $51,529.16 in IRA account No. XXXX with M & T Bank, and the sum of $35,007.89 in IRA account No. XXXX with M & T Bank. All accounts had been changed on December 14, 2000 by Max to designate Paul as beneficiary. Certain other claims against Paul were also raised by the estate.
On June 13, 2005, this court granted partial summary judgment to the estate with respect to a debt owed by Paul in the amount of $24,460. However, an additional related amount of $7,165 remained in dispute. All remaining issues, which revolved around the M & T bank account and IRAs, were set down for trial, which took place on consent of the parties before the Chief Court Attorney as Referee. The parties waived a report by the Referee and consented that the issues be decided by this court on the record of the trial proceedings. Briefs have been submitted by the parties over an extended period of time, and the matter may now be decided.
*896 Prior to the trial, as reflected in their briefs, the parties settled the issue of the outstanding $7,165, and this issue requires no further determination by this court. The only issues to be determined involve the three M & T accounts.
A
It is clear from the testimony that decedent was a person who was sharp-minded and who knew (and did) precisely what he wanted. Max was a self-made businessperson “who loved his money” (in the words of his cousin), and he was a person who “gave direction” rather than followed directions (in the words of his longtime attorney, Howard Kleiman). This understanding of Max’s personality is essential to resolving the issues before this court and in understanding what Max did and what he intended with respect to his estate.
In late 2000, Max was diagnosed with terminal cancer and he died on January 11, 2001. The testimony establishes that, upon learning that his illness would be fatal, Max put into motion a plan to dispose of his assets, which in certain respects was not achieved by traditional estate planning. Max’s plan appeared to be directed to one end, to avoid a prolonged probate process so that his many friends and family would receive their bequests in an expedited manner.[2]
Toward this end, Max changed the beneficiary designation on three significant accounts, all at M & T Bank, on which Max named his nephew, Paul, as beneficiary. Additionally, and of critical importance here, Max then drafted and left a letter of instructions for Paul as to what he, Max, wanted Paul to do with the monies in the three accounts.
Specifically, on December 14, 2000, approximately a month prior to his death, Max went to his M & T Bank branch and met with Lynn Roche, who had been Max’s banker for approximately 16 years. Roche testified that Max wanted to change the beneficiary on his two IRA accounts and on his savings account from Dominic Braceo to Paul Oleandi, but he did not tell Roche why he was making that change.
At the hearing, the deposition testimony of Lena Trowbridge[3] was admitted into evidence without objection. Lena testified that, in December of 2000, Max told her
*897 “the reason why he put Paulie’s name on all of the accounts [was] so we wouldn’t have to wait for probate. It was his desire that his assets pass outside of probate ... he told me he was gonna leave me the house . . . [a]nd that there was going to be a lot of money to follow and Amanda would be able to go to college and I would be able to retire.”
Lena also testified that during that same discussion Max told her “he was going to give Paulie around thirty thousand dollars.”
Lena’s husband, Gregory Trowbridge, testified at the hearing that, on October 22, 2000, Max visited him and his daughter Amanda, after Lena had suffered a stroke. Max told Gregory that he was leaving his Alberta Drive house and a large sum of money to Lena when he died. Later in 2000, Max took Gregory, Lena, and Amanda to dinner to discuss his estate plans. At that dinner, Max reiterated that he was leaving Lena the Alberta Drive house and an unspecified sum of money, and “that he would be putting his nephew Paulie on the bank accounts to avoid probate so that everyone could get what he planned to give them sooner than usual.” Gregory also recalled Max stating that as to “what cash there was, this would be split up between Lena and her sister.”
At both his pretrial deposition and during the hearing, Paul testified that, approximately three to four weeks prior to Max’s death — which would have been around the same time that Max made Paul the beneficiary of his accounts — Max gave him a sealed envelope and told him to open the envelope after his death. Paul had no knowledge of the contents of the envelope until after Max died, and he testified that he opened the envelope following Max’s funeral on January 15, 2001. Paul said that the envelope contained a handwritten note by Max which gave instructions about the distribution of his assets. According to Paul, Max asked in the letter that Paul “please do this for me because this is what I want,” and then Max gave handwritten instructions regarding monetary distributions he, Max, wanted Paul to make.[4]
From what Paul could recollect, the note included specific bequests in the amounts of $2,500 to Aunt Stella, $2,500 to *898 Aunt Josephine, $5,000 to cousin Charlie, $2,000 to cousin Maryann, $200 to a friend named Bonnie, and $100 to cousin Camille. Paul testified that the letter also stated that “if you want” give “IRAs to the kids.” This, Paul said, gave him complete discretion over distribution of these assets. There was no testimony regarding any instruction by Max as to who was to receive the balance of the savings account after the aunts, cousins and friend had been given a share.
As noted supra, Max died on January 11, 2001. Early that day, Max made a call to his longtime attorney, Howard Kleiman. Kleiman testified that Max called him to draft a new will, instructing that Paul be named as executor of his estate. The new will was to leave his Alberta Drive property to Lena, and the residuary estate was to go in equal shares to Lena, Deborah, and Dominic. Max told Howard that Paul would bring him instructions regarding the changes. Max made no mention to Howard regarding his earlier change to his M & T Bank accounts, nor did he mention his sealed letter of instructions to Paul.
On the afternoon of January 11, 2001, Paul dropped off Max’s instructions about the new will to Kleiman, and a copy of that has been admitted into evidence. Paul testified that he had no knowledge as to the content of those instructions. The new will instructions are written on the back of an envelope and reiterate that Lena is to get the Alberta Drive property; Lena, Deborah, and Dominic are to “share in Colvin property”;[5] and there is a note written next to the names of Lena, Deborah, and Dominic which states “also I.R.A money.”
The revised will was never executed because Max died at approximately 10:00 p.m. on January 11, 2001, and Kleiman was unable to make it to Max’s house that evening. Despite the fact that the new will was never executed and the 1987 will has been probated in this court, Lena and Deborah have agreed to share the residuary estate and whatever may be recovered in this proceeding equally with Dominic to honor Max’s wishes as reflected in his unexecuted 2001 will.
Judith Braceo, Dominic’s wife, testified that, after the funeral on Monday, January 15, 2001, she, Lena and Deborah asked Paul if they could meet with him to discuss Max’s affairs. Paul *899 suggested that they all go see Max’s attorney, Howard Kleiman. Judith testified that on January 16, 2001, she and the other children met with Kleiman at his office, but Paul was not present. They were told about the unexecuted will and, at that point, Lena and Deborah agreed to honor the new will’s terms and share the estate equally with Dominic.
Paul testified that, on January 16, 2001, the day after Max’s funeral, he went to M & T Bank and met with Lynn Roche because Max had told him to go to the bank after he died. Paul said Roche told him that he was the beneficiary of Max’s IRA accounts and the savings account,[6] which was the first time Paul learned about that. Paul then had Roche call Howard Kleiman, because Kleiman was the estate attorney, and Paul testified that, after Kleiman had spoken with Roche, Kleiman and a lawyer employed by M & T Bank explained separately to him that the accounts were not subject to the will and that the money in the accounts was his. Roche testified that Paul did not withdraw any money from the accounts at this meeting on January 16, 2001.
On the evening of January 16, 2001, Judith Braceo, Lena, Deborah, and Paul met at Max’s house. Judith and Deborah testified that Paul told them that Lena was to get the Alberta Drive house and that there was a lot of money and that Lena, Deborah and Dominic would each receive approximately $100,000, in addition to monthly income from a cross-purchase agreement Max had with Paul Francoforte. Specifically, Judith testified that Paul told them
“Lena is supposed to get the house and that there was a lot of money. There was more money than what we knew and that each of us were going to get about a hundred thousand dollars apiece. On top of that, there was a cross purchase agreement, that we would be getting monthly incomes off of that, that he was going to get everything going.”
On January 17, 2001, after allegedly telling Lena, Deborah, and Dominic that they each would receive $100,000, Paul testified that he returned to M & T Bank and had three separate checks in the amount of $25,000 each issued from the M & T savings account made payable to Lena, to Deborah, and to Judith Braceo (on behalf of Dominic). He claimed he had the checks issued from the savings account because he was advised *900 that closing or withdrawing from the IRA accounts would result in taxes and penalties.
That evening, January 17, 2001, Paul returned to Max’s house and met with Judith, Lena, Deborah and Dominic. Judith, Lena, and Dominic testified that Paul distributed the three $25,000 checks, and when he was asked by them why the total amount was not $100,000, Paul stated that the rest of the money would be coming before they left Buffalo.[7]
Paul’s testimony differs about the $25,000 checks. He testified as follows:
“I explained to them that their father says if I wanted to give them the IRA money I can, but it would take penalties and this and that, and I figured that this would be better for them so they can have some money now, and will — I explained to them that you are going to get money from the Colvin property, that they have to go back to Howard and learn how the estate goes, and I explained to them that your father wanted the property money to go monthly, that I know. I don’t know how much or what.”
On January 19, 2001, Judith, Dominic, Deborah, Lena and Paul all met at Howard Kleiman’s office. Judith testified that Paul stated that he had checked with an attorney and that all of the money was legally his, an emotional scene ensued, and the meeting came to an abrupt end. The parties had no further contact until the commencement of this proceeding.
B
The fundamental question this court must decide is whether Max’s actions, and the letter of instructions left to Paul regarding Max’s wishes regarding distribution of the IRA accounts and the savings account, have legal significance which require that this court impose a constructive trust over those assets to prevent Paul from being unjustly enriched.
“Generally, a constructive trust may be imposed ‘[wjhen property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest’ (Beatty v Guggenheim Exploration Co., 225 NY 380, 386; 1 Scott, Trusts [3d ed.], § 44.2, p 337; 4 Pomeroy’s Equity Jurisprudence [5th ed.], § 1053, p *901 119)” (Sharp v Kosmalski, 40 NY2d 119, 121 [1976]).
To state a cause of action for the imposition of a constructive trust, a petitioner must plead and prove four essential elements: (1) a confidential or fiduciary relationship; (2) a promise; (3) a transfer in reliance thereon; and (4) unjust enrichment caused by breach of the promise (id.). These elements are not to be rigidly applied when determining whether a constructive trust is to be imposed, and the constructive trust doctrine requires an “application of the general rule that equity regards as done that which should have been done” (Simonds v Simonds, 45 NY2d 233, 240 [1978]). “Thus, the required promise may be inferred where the totality of the transactions and the relations of the parties would render an express promise ‘superfluous’ (Sinclair v Purdy, 235 NY 245, 254 [1923]). Unjust enrichment is the heart of the constructive trust doctrine” (Bolla v Bolla, 10 Misc 3d 906, 911 [2005]).
In Matter of Trachtenberg (NYLJ, Mar. 22, 1995, at 28, col 3), the residuaiy bequest in a will stated, “I leave it entirely to my named beneficiaries to do with this legacy whatever they in their sole judgment and discretion deem desirable.” The court, in construing this provision, stated:
“Ordinarily, when a testator expresses suggestions or desires as to the use of a bequest, no legal restrictions are imposed upon the legatee. The testator’s wishes are viewed as no more than advisory, particularly where, as here, the preferences are clothed in a layer of qualifying language giving the legatee unfettered discretion (Lawrence v. Cooke, 104 NY 632; Matter of Steiner, 134 App Div 162; Matter of Burch, 152 Misc 387, affd 243 App Div 663).
“There are, however, instances where ignoring the testator’s suggestions would be manifestly unfair and create unjust enrichment. Sometimes, for example, a legatee receives a bequest only because the testator believes it will be turned over to a third party. In such cases, whether or not the legatee has made a specific promise to turn over the funds, the court will impose a constructive trust upon the bequest and direct that it be distributed in accordance with the testator’s wishes. (See, Trustees of Amherst College v. Ritch, 151 NY 282; Matter of Arnold, 4 Misc 2d 970, affd, 3 AD2d 998, lv denied, 4 AD2d 832; Becchetti v. Rubin, NYLJ, Sept. 30, 1993, at 23, col 3)” (id. [emphasis added]).
*902 There is no question that a confidential relationship existed between Max and Paul. “A confidential relationship is . . . one arising out of a ‘close and intimate association which creates and inspires trust and confidence between the parties’ (106 NYJur2d Trusts § 157 at 195)” (Matter of Passalacqua, NYLJ, June 10, 2005, at 34, col 6, at 35, col 6). Paul and Max maintained a father and son relationship throughout Paul’s life, and Paul was involved in the daily care of Max and his second wife, Katherine, prior to and throughout both of their battles with cancer. Although Max was dependent on Paul for many of his physical needs during his illness, it is uncontroverted that Max was always of sound mind and maintained complete control over his business and personal financial interests. Paul had no role in Max’s decisions regarding his finances or estate planning, with the exception of acting as a chauffeur to a few appointments.
I find, based upon the credible evidence in this record, that, because of the immense trust and confidence Max had in Paul, Max devised a plan to avoid probate and distribute his assets immediately after his death, which he believed would be executed by Paul, despite Paul having no prior knowledge of such plan. Because of their relationship, Max had implicit faith that Paul would execute his wishes, and gave him a sealed letter of instructions to be opened by Paul after he (Max) had died.
In this regard, Judith Braceo testified that when she came to Buffalo to stay with Max on January 4, 2001, several days prior to his death, in a conversation one night with her Max was “melancholy, very sentimental” and said:
“[h]ow much he loved me and the family; told me that everything was going to be okay, you know, he had gotten everything taken care of. Paulie was helping him out on all the stuff that he was worried about, how the kids were going to be taken care of, you know. He said that there was — one of the properties was closing or hadn’t quite closed or was going to close. It was money coming in on that. Paulie knew what to do. He was going to take care of all of that. He was — but that one was — Lena was going to get the house.”
Judith testified that there was one other occasion before Max’s death that she attempted to talk to Max about his affairs when Paul was not at Max’s house:
“[I]t was, again, in the middle of the night, and it *903 wasn’t as emotional. It was short. He was up for a little bit and I attempted to — because Paulie wasn’t there, I attempted to take advantage of that opportunity to try and talk to him and it was just — he referred to me as Jude. He said Jude, everything is going to be okay. I’ve got — everything is going, Paulie’s been a great help in helping get all the stuff straightened away. It’s all going to be okay, you know, and he was — at that point he was not — his time on it were limited, it would be limited. Then he had gone back and lay down and go right back to sleep again.”
“The existence of a confidential relationship may substitute for an express promise, to the extent that an inference may be drawn that the holder of legal title was not intended to be the beneficial owner (see Matter of Wieczorek, 186 AD2d 204 [2d Dept 1992], leave to appeal denied 81 NY2d 990, reargument denied, 82 NY2d 707; Farano v. Stephanelli, 7 AD2d 420 [1st Dept 1959])” (Matter of Passalacgua, NYLJ, June 10, 2005, at 35, col 6).
Max’s conversations with Judith Braceo demonstrate that Max had placed immense confidence and trust in Paul to execute his wishes, even without Paul’s knowledge of such plan.
In this regard, I note that Max’s letter of instructions to Paul no longer exists. Paul destroyed that letter at some point in the two-year period after Max’s death and before the commencement of this proceeding. The estate contends that this court should draw an adverse inference that the letter of instructions must be construed to be unfavorable to Paul’s position at this hearing because he destroyed it. “The court has broad discretion in determining the sanction for spoliation of evidence and may, under the appropriate circumstances, impose a sanction if the destruction occurred through negligence rather than willfulness (see Iannucci v Rose, 8 AD3d 437, 438 [2004])” (Molinari v Smith, 39 AD3d 607, 608 [2007]). “[A]n adverse inference charge against defendant is an appropriate sanction for the spoliation of evidence” (Tomasello v 64 Franklin, Inc., 45 AD3d 1287, 1288 [2007]). Sanctions may also be appropriate where, before the negligent spoliator became a party, he or she was on notice that the evidence might be needed for litigation (see Enstrom v Garden Place Hotel, 27 AD3d 1084, 1086 [2006]).
I find that Paul’s explanations for destroying the letter, although not consistent, are reasonable and credible, and although *904 such action of destruction may have been negligent, I do not believe he destroyed the letter in order to impede any action against him. Significantly, Paul testified, without evidentiary contradiction, that when he threw out the letter of instructions he had not heard from the estate or any of Max’s children since their last meeting in Howard Kleiman’s office in January of 2001. Thus, because this proceeding was not commenced until April of 2003, and because Paul had no reason to expect that the letter of instructions would later become important, I find that no adverse inference should be drawn against him.
Absent the letter of instructions available in this record, the issue is whether it can be determined from what is before the court what Max had directed Paul to do. I find that the record is sufficient in this regard.
First, I find that Paul did tell Max’s children on the evening of January 16, 2001 that each of the three of them — Lena, Deborah and Dominic — would receive $100,000 in addition to the money they would receive over a period of time from a cross-purchase agreement. The testimony of Judith Braceo was credible on this point and it is consistent with what Gregory Trow-bridge testified that Max had told him about his (Max’s) general plans. Given the fact that the three bank accounts at issue were nearly $500,000 on Max’s death, I perceive no reason why, if the testimony of Judith Braceo and others about what Paul told them on January 16, 2001 was not true, they would have chosen an arbitrary figure of $100,000 to be received by each rather than simply saying that all Max’s money was going to be split equally among the three children.
Finally, I find that Paul’s explanations about why he gave Max’s three children initial checks of $25,000 each is not credible. If Paul had in fact been following instructions to give Max’s three children the IRA monies — which total approximately $86,000 — why would he have made payments totaling only $75,000 rather than the full amount?
Both Judith Braceo and Gregory Trowbridge are disinterested witnesses within the meaning of the law, whereas Paul clearly is not. Under all the circumstances, I credit the testimony of Judith and Gregory, and disregard that of Paul, on the issue of what was contained in Max’s sealed letter of instructions to Paul concerning the disposition of his three M & T Bank accounts insofar as Lena, Deborah and Dominic were concerned.
Thus, I conclude that Max’s sealed letter of instructions to Paul directed him to pay over to Lena, Deborah and Dominic, *905 from the three M & T accounts, the sum of $100,000 each. I further conclude that Paul’s payments to Max’s other family members and friends, as testified to by him, were also the result of Max’s sealed instructions to Paul.
C
I conclude that Max directed Paul to pay the sum of $100,000 to each of his three children, Lena, Deborah and Dominic, from the monies in his M & T accounts. Because Paul has made initial payments to each of the three of $25,000 each, another $75,000 remains due and owing to each. And, because I further conclude that all necessary elements have been established for the imposition of a constructive trust, I hereby grant the same with respect to $225,000 of the current remaining balance. Upon payment of $75,000 to each of Deborah and Dominic, and to the estate of Lena Trowbridge, the monies remaining in Max’s M & T accounts shall be Paul’s without any further claim thereon in this matter. Finally, I direct that Paul shall make such $75,000 payments to Deborah, Dominic and the estate of Lena Trow-bridge on or before May 15, 2008.

. Unfortunately, the steps Max took have given rise to this extended litigation, the very result he hoped to avoid.

. At the time of the hearing, Lena was seriously ill and did not come to court or testify.

. The actual letter was destroyed by Paul some time within the two years after Max’s death. Paul testified that he “threw it out” because he had completed all of the dispositions required by the letter. Paul later testified that he probably threw the letter out while cleaning his desk, which he did approximately every three months.

. Max had entered into a cross-purchase agreement with his business partner, Paul Francoforte, which resulted in monthly income upon Max’s death.

. On January 16, 2001, the aggregate value of these three accounts appears to have been approximately $500,000.

. Deborah lived in Arizona and Judith and Dominic resided in Florida.